## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

NICHOLAS HIRSCH,

          *Defendant*

13 Cr. 268-20 (JMF)

---

### DEFENDANT NICHOLAS HIRSCH'S SENTENCING MEMORANDUM

**ALSTON & BIRD LLP**
**Craig Carpenito**
**Brian J. Fields**
**90 Park Avenue**
**New York, New York**
**(212) 210-9400**

Attorneys for Defendant
Nicholas Hirsch

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................ii

PRELIMINARY STATEMENT.........................................................................1

PROCEDURAL BACKGROUND.....................................................................2

SENTENCING UNDER 18 U.S.C. § 3553(a)....................................................3

   I.     Nicholas' Personal History and Characteristics....................................4

          Nicholas' Commitments to Family, Friends and the Community ................5

          Nicholas' Education and Commitment to His Career....................................8

          Nicholas' Friends and Colleagues Have Not Lost Any Faith or Trust in the Man They Know, and They Look Forward to Working with Him Again..........................................................................................................10

   II.    The Nature of Nicholas' Relevant Criminal Conduct Justifies a Below-The-Range Sentence........................................................................................11

   III.   Below-The-Range Sentence is Sufficient to Provide Just Punishment for the Offense........................................................................................................15

          Nicholas' Criminal Conduct is Aberrational ................................................15

          Nicholas Appreciates the Gravity of His Conduct and the Need for Deterrence Has Already Been Served ..........................................................16

          There is No Need to Protect the Public from Nicholas..................................17

          Nicholas Does Not Need Any Correctional Treatment and Intends to Counsel Others on Avoiding His Pitfalls......................................................18

          The Need to Avoid Unwarranted Sentence Disparities ................................18

CONCLUSION.................................................................................................23

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Kimbrough v. United States*,
    552 U.S. 85 (2007)................................................................................................3

*Koon v. United States*,
    518 U.S. 81 (1996)................................................................................................3

*Rita v. United States*,
    551 U.S. 338 (2007)..............................................................................................3

*Shaoul v. U.S.*,
    104 F.3d 351 (2d Cir. 1996)................................................................................12

*U.S. v. Aljahmi*,
    No. 10 Cr. 1144-01 (RWS), 2001 WL 5101568 (S.D.N.Y. Oct. 25, 2011)............19

*U.S. v. Amiel*,
    95 F.3d 135 (1996)..............................................................................................12

*U.S. v. Blake*,
    No. 10 Cr. 349 (RPP) (S.D.N.Y.) ......................................................................21

*U.S. v. Blake*,
    Nos. 10 Cr. 349 (RPP), 2012 WL 3154989 (S.D.N.Y. Aug. 3 2012)....................21

*U. S. v. Celestin*,
    No. 03 CR. 0597(RWS), 2004 WL 1348993 (S.D.N.Y. June 15, 2004).........20, 21

*U.S. v. Charman*,
    No. 08 Cr. 1154-01(RWS), 2009 WL 4858047 (S.D.N.Y. Dec. 9, 2009)..............20

*U.S. v. Cruz*,
    No. 11 Cr. 263-01 (RWS), 2011 WL 4495321 (S.D.N.Y. Sept. 28, 2011) ............19

*U.S. v. Edelman*,
    No. 06 Cr. 0002 (RWS), 2006 WL 1148701 (S.D.N.Y. Apr. 24, 2006) ................19

*U.S. v. Hanna*,
    No. 02 CR. 1364-01(RWS), 2003 WL 22705133 (S.D.N.Y. Nov. 17, 2003) ........20

*U.S. v. McDaniel*,
    No. 09 Cr 356-01(RWS), 2009 WL 3739339 (S.D.N.Y. Nov. 9 2009) ................20

**Cases**                                                                                          **Page(s)**

*U.S. v. Rosales,*
    No. 13 Cr. 518 (KPF) (S.D.N.Y.) ................................................................12

*U.S. v. Ting,*
    No. 13 Cr. 268 (S.D.N.Y.) ..........................................................................22

*United States v. Booker,*
    543 U.S. 220 (2005) .....................................................................................3

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005) .........................................................................3

*United States v. Gall,*
    552 U.S. 38 (2007) ........................................................................................3

*United States v. Jones,*
    460 F.3d 191 (2d Cir. 2006) .........................................................................3

*United States v. Preacely,*
    628 F.3d 72 (2d Cir. 2010) ...........................................................................3

**Statutes**

18 U.S.C. §1084 .................................................................................................5

18 U.S.C. § 1349 ...............................................................................................2

18 U.S.C. § 1955 ..............................................................................................22

18 U.S.C. §3553(a) ................................................................................. *passim*

18 U.S.C. § 3553(a)(1) ......................................................................................3

18 U.S.C. § 3553(a)(6) ...............................................................................18, 21

U.S.S.G. § 2B1.1 .............................................................................................13

U.S.S.G. § 2B1.1, Note 3(B) .............................................................................2

U.S.S.G. § 3B1.1(c) .........................................................................................22

## PRELIMINARY STATEMENT

Nicholas Hirsch accepts full responsibility for his conduct and now comes before this Court to accept the consequences of his actions.  He understands that the path that brings him before Your Honor was forged of his own free will and poor decision.  He is truly sorry for his actions.  He has compromised a promising career in the financial services industry, built through a decade of hard work, and tarnished an otherwise impeccable reputation.  He has disappointed family and friends.  For this, he blames no one but himself.

He asks only that the Court will consider the man as a whole, and not just the aberrational conduct detailed in the indictment.  Nicholas has never run afoul of the law before.  To the contrary, since childhood, Nicholas has embraced a moral obligation to help others, perhaps best exemplified by his commitment to his lifelong friend, an epileptic who suffers unpredictable and violent seizures.  As the two dozen letters submitted on "Nicky's" behalf evidence, he is a loving son and brother, a loyal and unselfish friend, and a hard worker with a sound moral compass.

Nicholas deeply regrets his actions, which have already brought him severe and irrevocable consequences.  In addition to being a convicted felon for the rest of his life, he has damaged a promising career and jeopardized a decade of experience in the financial services industry. His reputation has been forever tarnished by the press coverage garnered by this case and his wrongful inclusion in a lengthy indictment concerning offense conduct largely unrelated to the charge to which he pled guilty.  Sadly, this unrelated offense conduct is replete with salacious allegations of a criminal enterprise involving the Russian mob, illegal gambling, racketeering, extortion, intimidation and threats of physical violence or economic harm.  Conduct that he is commonly associated with, despite being the sole defendant who is not alleged to be a member of that enterprise.

1

For these and the additional reasons set forth below, we respectfully request that Your Honor sentence Nicholas to a non-custodial sentence.

## PROCEDURAL BACKGROUND

Nicholas was charged as part of a 34-defendant, 27-count indictment (the "Indictment") and was arrested on April 16, 2013 in his home in New York.  Nicholas was named as a defendant in a single count contained within the Indictment and is not alleged to be related to the remaining 26 counts in any way.  Indeed, Nicholas is only mentioned in two of the indictment's 104 Paragraphs and is the sole defendant who is not alleged to be a member of the alleged racketeering and gambling enterprises.

In August 2013, prior to filing motions or otherwise challenging the Government's case, Nicholas approached the Government and initiated a dialogue concerning a potential plea agreement.  As a result, on October 16, 2013, Nicholas pled guilty to Count 15 of the Indictment – conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349.

The plea agreement contains a stipulated forfeiture amount of $25,000 and a presumptive offense level of 9, with a corresponding Guideline range of 4 to 10 months custodial sentence. The offense level and Guideline range reflect that the loss from the offense could not reasonably be calculated, and that Nicholas' gain from the offense should be used instead. U.S.S.G. § 2B1.1, Note 3(B).  We do not dispute the Guidelines calculation that produces this range.   The plea agreement also stipulates that the defense can argue for a below-the-range sentence based on factors enumerated in 18 U.S.C. §3553(a), which we do herein. [1]

---

[1] We have not yet had the opportunity to review the final Presentence Report ("PSR") submitted by the Probation Department.  With respect to the Probation Department's preliminary report, dated January 17, 2014, Nicholas filed objections and responses (made on his behalf by counsel) on February 5, 2014.

## SENTENCING UNDER 18 U.S.C. § 3553(a)

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crimes and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  The factors outlined in 18 U.S.C. § 3553(a) have taken on renewed vitality in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005), requiring "sentencing courts to treat the Guidelines only as a starting point, and then to craft an appropriate sentence taking full account of 'the history and characteristics of the defendants.' 18 U.S.C. § 3553(a)(1)." *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (J. Lynch concurring).  Sentencing courts "may not presume that the Guidelines range is reasonable" or that "'extraordinary circumstances" are required "to justify a sentence outside the Guidelines range." *United States v. Gall*, 552 U.S. 38, 47, 50 (2007); *see also Rita v. United States*, 551 U.S. 338, 351 (2007).

The "overarching" charge of Section 3553(a) is the "Parsimony Clause," which "instruct[s] district courts to 'impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (emphasis added).

Judges have freedom to exercise discretion in fitting sentences to a defendant's individual circumstances, *see United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005), and to give "consideration [to] the judge's own sense of what is fair and a just sentence under all the circumstances." *See United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

The §3553(a) factors are well-known to the Court:

(a)      Factors to be considered in imposing a sentence. –The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.  The court, in determining the particular sentence to be imposed, shall consider –

(1)      the nature and circumstances of the offense and history and characteristics of the defendant;

(2)      the need for the sentence imposed –

        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B) to afford adequate deterrence to criminal conduct;

        (C) to protect the public from the further crimes of the defendant; and

        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)      the kinds of sentences available;

(4)      the [Sentencing Guidelines]

***

(5)      any pertinent policy statement –

***

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)      the need to provide restitution to any victims of the offense.”

We respectfully submit that upon consideration of all pertinent factors, a below-the-range, non-custodial sentence is just and appropriate.

## I.    Nicholas' Personal History and Characteristics

Nicholas was born June 17, 1978 in New York City to parents Barry and Roseann Hirsch. Barry Hirsch, age 71, is a retired television producer.  His wife of more than 40 years, Roseann, is 72 years old and a retired publisher.  Nicholas grew up the second of three boys.  His older

brother, Brian Hirsch, age 42, lives in Los Angeles, California. His younger brother, Jonathan Hirsch, age 30, lives in New York. [2]

### Nicholas' Commitments to Family, Friends and the Community

Perhaps the best measure of Nicholas can be taken from those who have known him throughout his life – his family, friends and former colleagues. The letters submitted on his behalf paint the portrait of a man deeply committed to these relationships. Nicholas' devotion to others, however, is not confined to his loved ones. As detailed below and in the letters submitted to the Court, Nicholas has always given time to those in need, whether it be a friend having health issues who needs motivation to work out and improve his health or sick children in hospitals he has visited on holidays while most people his age are enjoying time with family and friends.

His older brother, Brian Hirsch, wrote that this unfortunate incident has forced him to "stop and ponder on all of the wonderful, loving, funny, fascinating, kind and genuinely special qualities of my brother Nicky, who I love, respect, appreciate and admire more than these words can express." (Ex. K, Br. Hirsch Letter). Brian Hirsch went on to describe how appreciative he is to have Nicholas in his life: "I'm a better man for knowing my brother Nicky. He has counseled me throughout my every difficulty and triumph in life, and I thank God for my brother's love and support every day." (*Id.* at Ex. K).

Brian Hirsch further recounted how his younger brother's commitment to helping those less fortunate dates back decades before the unfortunate conduct that brings him before the Court

---

[2] Nicholas' parents, who have devoted themselves to raising three respectful and upstanding young men, are now suffering the anguish of watching two of their children face felony convictions. Jonathan Hirsch is also a defendant in the instant case. On December 4, 2013, Jonathan Hirsch pleaded guilty to Count 10 of the Indictment, the illegal transmission of betting and wagering information in violation of 18 U.S.C. §1084. He is scheduled to be sentenced before this Court on April 10, 2014.

today, stating "[m]y parents and I often took note of the depth of compassion and sympathy he had for those less fortunate, and I remember my parents frequently commenting on how proud his small acts of kindness made them feel. They made me feel proud too." (*Id.* at Ex. K). His father, Barry Hirsch, wrote of what their family calls Nicholas' "generous gene" and how, even at 11 years old when most children are not yet cognizant of the harsh realities of life, he would ask his father for money for the city's homeless:

> Nicky tapped my hand: "Dad, can I have five dollars?" "Why?", I asked. You see that homeless man over there? I'd like to give it to him." "Can't you give him a dollar?", I replied. "NO!" said Nicky emphatically. "He really needs food and that costs more. You can take it out of my allowance, can't you?"

(Ex. I, Ba. Hirsch Letter). "Nicky" convinced his father to give him the five dollars, and walked over to the homeless man – an image forever burned into his father's mind, but also just one act that exemplifies a lifetime of similar acts of kindness. (*Id.* at Ex. I).

Nicholas' dedication to helping others has continued into adulthood. What is truly significant about Nicholas' benevolence is that it reaches beyond the swipe of a credit card or the signing of a check. Nicholas gives the most valuable thing he can – his time and energy.

Perhaps Nicholas' deepest devotion to those in need rests in his commitment to his lifelong friend and longtime roommate, Gerard Jeffrey. Gerard suffers from tonic-clonic seizures (formerly known as grand mal seizures), a byproduct of his epilepsy. Gerard has had a number of significant seizures while living with Nicholas. "The different instances vary but the results are the same. When [Gerard has] a seizure the potential for injury is great, and it is critical that those around [him] know how to manage the situation." (Ex. L, G. Jeffrey Letter). As detailed in his letter, Nicholas' knowledge of this disease has been critical to safeguarding Gerard,

compelling him to tell the Court: "[f]or the last decade, Nicholas has been my caretaker and, at times, my savior." (*Id.* at Ex. L).

The risk of Gerard living alone or without someone who can manage his condition is not just hyperbole or a strained effort to help his friend in a time of need. To the contrary, Gerard's physician, Dr. Orrin Devinsky, a leader in the field and the Director of the NYU Epilepsy Center, confirmed in his letter:

> These seizures can cause significant injury and may be fatal. Living with another individual who is knowledgeable about epilepsy and seizure first aid can be potentially lifesaving, and prevent Sudden Unexpected Death in Epilepsy (SUDEP).

(Ex. G, O. Devinsky Letter). As Gerard's letter to the Court poignantly illustrates, Dr. Devinsky's words are not theoretical.

An Ivy League graduate with a decade of success on Wall Street to his credit, Nicholas could afford to live on his own, as most of his peers would prefer. However, he lives with Gerard because he understands Gerard's illness and that, without him, Gerard would be unable to live independently. Gerard himself summed it up best: "Nicholas is one of the few people I can truly rely on, and I trust him with my life." (Ex. L, G. Jeffrey Letter).

Nicholas' kindness is not confined to those who he knows personally. He also volunteers and helps others in the community. For example, as detailed in the letter submitted by magician David Blaine, Nicholas has always been deeply interested in his charitable work with sick children and adolescents confined in hospitals or other institutions. (Ex. A, D. Blaine Letter). "Nicky" has attended numerous such events throughout the years with David, often during the holiday season or when others are traveling and spending time with family and friends, including visits to the Children's Hospital at NYU Langone Medical Center, the Memorial Sloan-Kettering

Cancer Center, the Ronald McDonald House, and the Bridges Juvenile Center. (*Id.* at Ex A). David describes Nicholas as a partner in organizing these events, whose "compassion and dedication can help these children forget the difficulties they are experiencing [.]" (*Id.* at Ex A).

In addition to these volunteer commitments, Nicholas intends to take what occurred here and turn it into an educational moment for others. In fact, David and Nicholas have discussed at length that his story – one of a life well led, derailed by a lapse in judgment leading to a felony conviction – is an important message for today's youth, and they intend to find ways to incorporate that message into these visits and help others avoid the situation Nicholas finds himself in today.

### Nicholas' Education and Commitment to His Career

Nicholas graduated from a private high school in New York City in 1996. After high school, he studied abroad at the American University in Paris, France, and eventually returned to the United States to attend Columbia University. Upon graduating from Columbia with a degree in History in 2002, Nicholas began a career in finance with Atlas Capital Services, LLC. With Atlas, Nicholas obtained his Series 7 (General Securities Representative), Series 63 (Uniform Securities Agent) and Series 24 (General Securities Principal) licenses.

As Nicholas matured at Atlas Capital, he earned the respect and trust of his boss and mentor, Atlas general counsel Robert Schechter. Mr. Schechter, who hired Nicholas, described the young man who started at Atlas as an intern as having a maturity beyond his years, focused on more than just economics:

> Not only was Nicholas hard working, but he demonstrated a keen moral and ethical compass. When most bankers asked "can we do something?" he asked the more difficult question: "should we do something?

(Ex. R, R. Schechter Letter).

In 2008, Nicholas joined Halter Financial Securities. Despite the job change, Nicholas'

dedicated approach remained strong. As his former colleague at Halter Financial Securities,

James Groh, wrote:

> Nick performed his duties admirably, and I can attest to several
> times where he took on a great deal of personal work to assure he
> and our firm were fully compliant. Nick has always operated with
> complete professional and personal integrity. We trusted him to be
> on the right side of things, and he did so during some of the most
> tumultuous times ever in the financial markets. He never once
> took "easy" instead of "right."

(Ex. H, J. Groh Letter).

George Diamond, the General Counsel for the Halter Financial Group (the

parent of Halter Financial Services) echoed Mr. Groh's sentiment:

> Nick was President of the firm and was responsible for its day-to-
> day operations. He always conducted himself in a professional
> manner and was highly respected by his associates. The record
> keeping and compliance demands of Halter Financial Securities
> were especially demanding; meticulous records were necessary to
> the success of the firm. Nick was entrusted with this substantial
> task, and through his scrupulous work ethic, he succeeded in
> keeping the firm compliant [.]

(Ex. F, G Diamond Letter).

J. Joseph Chai, another former colleague of Nicholas, was moved to note: "I have never

encountered anyone who is as adept as Nicholas at dispensing advice." (Ex. B, J. Chai Letter).

In more than ten years in the financial industry as a licensed professional, Nicholas did

not garner a single customer complaint and was never the subject of any lawsuit or disciplinary

hearing.

In summary, Nicholas' commitment to family, friends, and community is uncommon and speaks to the person he truly is and demonstrate how truly aberrational the offenses conduct detailed below is.

**Nicholas' Friends and Colleagues Have Not Lost Any Faith or Trust in the Man They Know, and They Look Forward To Working with Him Again.**

The sentiments of respect and trust expressed in the letters submitted to this Court reach beyond the pages on which they were printed. There may be no better example than the responsibility that Benjamin Steiner has bestowed on his long-time friend. As any parent knows, there may be no greater responsibility than ensuring the welfare of one's children. For this, Ben has selected Nicholas to play a critical role.

Ben has known Nicholas for more than 20 years, both personally and professionally when the two worked together in the securities industry. Ben and his wife have created a substantial trust for the benefit of their children. As detailed in Ben's letter, when he and his wife had to select the one person they believed would watch over their children as protector, they found Nicholas the obvious choice. Nicholas has discussed this case with Ben and his wife at length, yet Ben's faith in his "most trusted business partner and friend" is unshaken. (Ex. T, B. Steiner Letter).

> I assure you that if Nick's integrity, ethics or trustworthiness were at all in question, as a loving father, I would take swift action to replace him with someone who did possess those character attributes to protect my children. To the contrary, even with the knowledge that Nick has made a grave mistake and will stand before Your Honor to accept responsibility later this month, my wife and I derive much comfort knowing that, if anything were to happen to us, our children would be in safe hands with Nick overseeing their trust administration.

(Id. at Ex T)

Ben also plans on resuming his professional endeavors with Nicholas once this case is resolved. "I have discussed with Nick the future of our business operations and the important role that I expect him to assume in the near future." (*Id.* at Ex T). Likewise, Nicholas' friend and business associate, Joseph Chai, remains committed to working with Nicholas in the future. Like Ben, Joseph works in the securities industry, a profession built on client trust. With the full knowledge of Nicholas' momentary transgression, Joseph has continued to work with Nicholas through the pendency of this case.

> I also understand the charges to which Nick has pled guilty and I am certain that this was a one-time aberration from his usual sterling character. My absolute confidence in that statement is demonstrated by the fact that I am working with him on an important business transaction at present and would have no hesitation in doing so again in the future.

(Ex. B, J. Chai Letter)

Gerard Jeffrey also continues to support and trust his longtime roommate and friend by incorporating him into Gerard's family business. (Ex. L, G. Jeffrey Letter).

## II.    The Nature of Nicholas' Relevant Criminal Conduct Justifies a Below-The-Range Sentence.

In his plea allocution before this Court, Nicholas admitted his transgression without reservation. In March 2012, at the request of a long-time friend (the "Victim"), Nicholas got involved in trying to help the Victim purchase a painting for her own purposes. At her initiation and request, Nicholas brokered a transaction between the Victim and a prominent art gallery (the "Gallery"). Nicholas told the Victim that he would represent her in the acquisition and act on her behalf, as her agent. However, Nicholas withheld information regarding his financial interest in the transaction to protect his commission on the sale. Nonetheless, Nicholas' conduct deviates

- 11 -

far from the typical wire fraud case and, we respectfully submit, Nicholas should not be sentenced in conformity with the standard wire fraud Guidelines.

The annals of cases involving wire fraud schemes are rife with elaborate rouses concocted and designed to separate the innocent from their money by selling the illusion of legitimacy. Typical art fraud cases vary subtly, but tend to remain faithful to the same theme – the perpetrator exchanges the victim's money for a fake piece of art, whether it be a counterfeit, a forgery, or a fraudulent provenance. Regardless of its form, the fraud usually penetrates the very heart of the deal – the authenticity of the artwork itself.[3]

By contrast, here, it is undisputed that the painting the victim purchased, *Carnaval à Nice* (1937) by the esteemed French Fauvist painter Raoul Dufy (the "Purchased Dufy"), is authentic. Indeed, Nicholas and his co-defendant offered the Victim five authentic paintings that would have been offered for sale by the Gallery at a price commensurate with what the Victim ultimately paid for the Purchased Dufy – $300,000.

Moreover, the timeline of events leading up to the final sale of the Purchased Dufy do not comport with an attempt to force the sale of an over-priced painting. The victim first approached Nicholas in March 2012. Several months later, in mid-May 2012, Nicholas emailed the Victim information from the Gallery concerning four paintings -- three paintings by Dufy and another painting by Pierre-Auguste Renoir. The catalogue data was accurate and comprehensive. It was the same information that would be sent to any other potential buyer interested in purchasing any of the respective paintings. The Victim, an Ivy League graduate who studied history and wrote

---

[3] The overwhelming majority of cases of art fraud we uncovered involve the sale of counterfeit or otherwise forged works. *See, e.g., U.S. v. Amiel*, 95 F.3d 135 (1996) (printing, and sometimes signing, thousands of prints sold as limited edition lithographs); *Shaoul v. U.S.*, 104 F.3d 351 (2d Cir. 1996) (filing fraudulent insurance claim for damage caused to painting that was actually fake); *U.S. v. Rosales*, No. 13 Cr. 518 (KPF) (S.D.N.Y.) (selling over 60 fake paintings over a 15 year period).

her senior thesis on the archiving of priceless works of art, independently rejected all four paintings. It was not until June 2012 that the victim decided to buy the fifth painting, the Purchased Dufy.

Indeed, Nicholas did not even advocate that the Victim buy the Purchased Dufy. Instead, as evidenced by his May 16, 2012 e-mail to the Victim, he expressed a personal preference for *Vue de Bretagne* by Renoir, which leading art auction house Christie's estimated to be worth as much as $355,450.[4]

More importantly, Christie's estimated the Purchased Dufy to be worth between $250,000 and $350,000 (not including the 20% buyer's premium) on November 6, 2008.[5]

Yet another barometer of the Purchased Dufy's current value can be gleaned from the recent auction sale of the comparable Dufy painting, *Nice, La Baie des Anges* (1928). Both works are oil on canvas waterscapes/cityscapes of Nice, painted by the same artist, Dufy, within a few years of each other, contain very similar colors, and are signed by the artist. The dimensions are also similar: the Purchased Dufy measures 15 x 18 inches, while *Nice, La Baie des Anges* measures 19 7/8 by 21 1/8 inches. On November 7, 2013, *Nice, La Baie des Anges* sold at Sotheby's auction for $437,000.[6]

Regardless, the Government itself stipulated to the impossibility of precisely measuring the value of something as ethereal as art in Nicholas' plea agreement. It is for this very reason that Nicholas and the Government have agreed, pursuant to Application Note 3(B) to U.S.S.G. §

---

[4] Christie's Impressionist and Modern Art Day Sale, Sale 7563, Lot 281. Note that the estimate of 120,000 to 180,000 GBP had the United States dollar equivalency of $236,966 to $355,450.

[5] Christie's New York, Impressionist and Modern Art Day Sale, Sale 2046, Lot 281.

[6] Sotheby's, Impressionist & Modern Art Day Sale, Sale 9036, Lot 219.

2B1.1, to use Nicholas' $25,000 gain as an alternative measure of calculating loss "because the loss cannot reasonably be determined."

Although Nicholas did not deprive the Victim the value she sought in the Purchased Dufy, he did deprive her of the knowledge that his motives were conflicted and that she could have potentially obtained a better purchase price, as evidenced by Nicholas' April 25, 2012 discussion with the Gallery, in which its owner indicated that:

> I'm going to sell her something for 300. What I'm going to do is this: normally I ask something 300 and then someone makes me an offer of like 275, 260, 280. I am just going to ask 300 and there is no offer. . . something that if you were to walk into my gallery would cost 300, if you did not want to make an offer, you just wanted to write a check, you see what I'm saying?

In other words, they would offer the Victim a painting that the Gallery would list at $300,000, but Nicholas would not advise the Victim to attempt to negotiate a better price where one possibly would be obtainable.

As expected, there was discussion between Nicholas and the Gallery about the profit it would realize on the art sale. During a March 25, 2012 telephone conversation, Nicholas suggested that the Gallery show the Victim paintings with "values" of $250,000 that could be "priced" at $300,000 so that it could make a $50,000 profit. It is clear under the circumstances that when Nicholas described the paintings' "values" as $250,000, he was referring to the cost basis and not the resale values.

Although Nicholas does not seek to justify his conduct, in our humble view, it is important to understand that the Victim received a painting of commensurate value.

## III. Below-the-Range Sentence is Sufficient to Provide Just Punishment for the Offense

No matter the sentence in respect of confinement or financial penalty that the Court ultimately deems appropriate, Nicholas' punishment is already underway, is severe, and will continue throughout his life. A man who previously never ran afoul of the law is now a convicted felon, effectively barred from the financial industry in which he had been successfully employed for more than a decade, and has brought a shame upon himself that, in the internet age, is easily accessible to anyone with a modem and keyboard.

Of course, this is Nicholas' own doing and he blames no one but himself. It is befitting of the crime, but not of the man who committed it. The behavior and conduct to which he pleaded guilty are inconsistent with the manner in which he otherwise conducted his life. We respectfully submit that the community is better served through the circulation of Nicholas' message to other young adults that even a momentary lack in judgment can lead to a lifetime of consequences.

### Nicholas' Criminal Conduct is Aberrational

Prior to the conduct that now brings him before the Court, Nicholas had never received so much as a traffic ticket, much less had any substantive brush with the law. Nothing in his personal or professional background would suggest that Nicholas would engage in any further wrongdoing.

The letters that have been submitted from his family, friends and colleagues afford insights into Nicholas' good moral character. We ask that the Court consider the letters conscientiously and factor them into its consideration in determining the appropriate sentence.

- 15 -

**Nicholas Appreciates the Gravity of His Conduct and the Need for Deterrence Has Already Been Served**

As the Court will hear directly from Nicholas on February 25, 2014, and as detailed in the numerous letters submitted by those who know him best,  Nicholas is acutely aware of how he wronged the Victim, a friend, and the significant pain and suffering his conduct has caused friends and family.  To be sure, the unintended victims of crimes such as Nicholas' are the people who have devoted their lives to the upbringing and improvement of a person, only to have their time, energy and love disenchanted.

In addition, as a formerly licensed securities professional, Nicholas understands the likely impact a felony conviction will have on his career in financial services.   In a business environment where reputation is everything, Nicholas has forever fettered his name to his crime.

Nicholas is deeply remorseful, not simply because he has negatively altered his life and profoundly hurt those who love him. As Nicholas' mother wrote:

> We've had moments together when he cried, and shared his fears for his future.  He told me he has replayed everything in his mind that led to his arrest, and how accepting his guilt has been a painful, but healing, process.  I believe his remorse is genuine and deeply felt.

(Ex. J, R. Hirsch Letter).  As demonstrated in many of the letters submitted on Nicholas' behalf, he took full responsibility for his conduct immediately. As his roommate and friend Gerard wrote:

> Within hours of being released after his arrest, Nicholas picked up the telephone and began making the most difficult telephone calls of his life.  He called his mother and father, both in their seventies, and gave them the unvarnished truth…The following day Nicholas made another gut wrenching telephone call, this time to his employer.   I listened as he detailed his conduct and offered his resignation.

(Ex. L, G. Jeffrey Letter).

Nicholas is a first time offender.  As the letters from his friends and family illustrate, Nicholas' illegal conduct was wholly uncharacteristic of a man who built a career on respect and trust and dedicated himself to helping those in need.  He is not a criminal from whom society needs protection and any form of confinement would accomplish nothing from a deterrence standpoint.

With respect to general deterrence, we respectfully submit that the consequences Nicholas has already suffered are more than sufficient to deter the general public from engaging in similar conduct.  Nicholas' story is cautionary tale of the highest magnitude: a man who had lived his entire life following the law destroyed his career as a licensed professional, brought shame upon himself and his family, and became a convicted felon – all in a single, ill-advised act.  We can hardly imagine anyone hearing Nicholas' story and not being profoundly deterred from risking the same fate.

More importantly, as detailed-above, the deterrent value of allowing Nicholas to tell his story to others to help them avoid his mistake far outweighs any benefit to society derived from a custodial sentence.

### There is No Need to Protect the Public from Nicholas

Nicholas poses no danger to society.  He is a non-violent offender whose conduct was isolated to a single transaction with a single Victim.  The offense conduct does not suggest a prolonged pattern of poor judgment that would raise concerns about the future, nor does it evidence Nick was a "predator" actively seeking out a victim.  Indeed, as is amply demonstrated by the letters submitted on his behalf, Nicholas built a lengthy track record of safeguarding the

trust of friends, family, and professional clients before this unfortunate incident.  There is simply no reason to believe that society needs additional protection from Nicholas Hirsch.

### Nicholas Does Not Need Any Correctional Treatment and Intends to Counsel Others on Avoiding His Pitfalls

Nicholas' former employer and longtime friend, Marat Rosenberg wrote that, "Despite this irreconcilable transgression, I know that Nick is destined for great things in his life and the best is yet to come." (Ex. Q, M. Rosenberg Letter).  With this Court's leniency, Nicholas intends to use this terrible experience to raise awareness about the consequence that can befall a momentary lapse of judgment.  As is clear from the letters submitted to Your Honor, Nicholas is a charismatic leader with a magnetic personality.  He has used that gift in the past to build strong social and professional relationships.  Now, he wants to apply those skills to alerting others to the consequences that follow a betrayal of trust.  Nicholas' friend Jay Van Sciver may have articulated it best in stating that he is certain Nicholas "would be very grateful for the chance to move on as a stronger, more careful person.  I believe Nicky is very worthy of that opportunity." (Ex. U, J. Van Sciver Letter)

### The Need to Avoid Unwarranted Sentence Disparities

A critical factor to be considered by this Court under Section 3553(a) is the need to avoid unwarranted sentence disparities.  *See* 18 U.S.C. § 3553(a)(6).  Given the recent sentences in theft and fraud cases[7] in this District, this factor favors a non-jail sentence.

A review of recent theft and fraud cases in this District and the sentences imposed reveals that non-cooperating defendants with conduct similar to Nicholas' often receive non-jail

---

[7] Due to a relative dearth of mail/wire fraud cases in this District with similarly situated defendants (i.e. those in Criminal History Category I and loss amounts of approximately $25,000), a discussion of defendants convicted of other types of fraud and theft is included herein.

sentences, with minimal or no home confinement.  In fact, non-jail sentences have been imposed on defendants who would appear to be more culpable than Nicholas, including several with greater offense levels and loss amounts.

For example, in *U.S. v. Cruz*, defendant Anyi Cruz was the customer service manager for the Cooper–Hewitt National Design Museum of the Smithsonian Institution ("Cooper-Hewitt") in charge of depositing the daily cash admissions each evening after closing.  *U.S. v. Cruz*, No. 11 Cr. 263-01 (RWS), 2011 WL 4495321 (S.D.N.Y. Sept. 28, 2011) at *2.  After Cooper-Hewitt noticed some irregularities with its deposit slips, Cruz was arrested and subsequently convicted of stealing between $40,000 and $56,000 in cash from Cooper-Hewitt in a scheme that she admitted had been ongoing for years.  *Id.*  Not only did Cruz's conduct result in a greater loss amount than Nicholas', but her culpability is enhanced by the fact that she had engaged in a prolonged and repeated course of misconduct.  Nonetheless, this District sentenced Cruz to a three year term of probation with three months home confinement.  *Id.* at *4.

The defendant in *U.S. v. Aljahmi* similarly engaged in a prolonged course of misconduct and also received a non-jail sentence.  Specifically, defendant Abdul Salah Aljahmi was convicted of food stamp fraud for processing countless transactions over a two-year period, resulting in a personal gain of between $10,000 and $30,000.  *U.S. v. Aljahmi*, No. 10 Cr. 1144-01 (RWS), 2001 WL 5101568, *1-3 (S.D.N.Y. Oct. 25, 2011).  Like Nicholas, he had an offense level of 9 and a Guidelines range of 4-10 months.  *Id.* at *5.  Aljhami was sentenced to three years of probation with three months home confinement.  *Id.*

The defendant in *U.S. v. Edelman*, was also similarly situated to Nicholas and received a non-jail sentence.  *U.S. v. Edelman*, No. 06 Cr. 0002 (RWS), 2006 WL 1148701, *6 (S.D.N.Y. Apr. 24, 2006).  There, defendant Lee Edelman traded on inside information on multiple

- 19 -

occasions, netting a gain of $22,786. Edelman's conduct, like the offense conduct here, was temporally limited, did not involve repeated acts, and resulted in a very similar loss amount. Despite a greater Guidelines range of 6-12 months, Edelman was given a non-jail sentence. *Id.* at *7.

In *U.S. v. Charman*, the defendant was convicted of bank larceny for participating in a credit card scheme that netted a total of $85,000 over nearly 18 months. *U.S. v. Charman*, No. 08 Cr. 1154-01(RWS), 2009 WL 4858047, at *1-2 (S.D.N.Y. Dec. 9, 2009). Defendant, who was in Zone C of the Sentencing Table, had an offense level of 12 and a Guidelines range of 10 – 16. *Id.* at *3. Nonetheless, the defendant was given a non-custodial sentence. *Id.* at *4.

In *U.S. v. Hanna*, defendant Yakoub Hanna, who also had a Guidelines range greater than Nicholas', received a non-jail sentence despite having a prior felony conviction for insurance. *U.S. v. Hanna*, No. 02 CR. 1364-01(RWS), 2003 WL 22705133, at *1 (S.D.N.Y. Nov. 17, 2003). There, Hanna pled guilty to trafficking in counterfeit goods valued between $5,000 and $10,000. *Id.* Defendant's offense level was 10 and Guideline range was 6 – 12 months. *Id.* at *2. Notwithstanding Hanna's felony conviction, the Court imposed a non-jail sentence. *Id.* at *3.

Indeed, a review of cases involving fraud-based convictions in this District with offense levels similar to Nicholas' indicates that these defendants frequently receive non-jail sentences. For example, the defendant in *U.S. v. McDaniel* pled guilty to Access Device Fraud for unlawfully stealing the personal information of a deceased couple, securing multiple credit cards with the information, and charging more than $19,000 over several months. *U.S. v. McDaniel*, No. 09 Cr 356-01(RWS), 2009 WL 3739339, at *2 - 3 (S.D.N.Y. Nov. 9 2009). Despite an offense level of 10 and a Guidelines range of 6 – 12 months, the defendant was given a non-jail sentence. *Id.* at *5. Similarly, in *U. S. v. Celestin*, defendant, a licensed physician, fraudulently

- 20 -

accepted approximately $6,000 in kickbacks over several years for referring Medicare patients to other doctors. *U. S. v. Celestin*, No. 03 CR. 0597(RWS), 2004 WL 1348993, at * 1- 3 (S.D.N.Y. June 15, 2004). Although defendant's offense level was 10 and his Guideline range was 6 – 12 months, he was given a non-jail sentence. *Id.* at *6.

Finally, the defendant in *U.S. v. Blake* was found guilty after trial of mail fraud for submitting an application for a death benefit for his deceased wife several months after their divorce was finalized. *U.S. v. Blake*, Nos. 10 Cr. 349 (RPP), 2012 WL 3154989, at *1-2 (S.D.N.Y. Aug. 3 2012). The defendant, who had an offense level of 9 and a sentence range of 4 - 10 months,[8] did not receive a jail sentence. *Id.* at *3.

Moreover, in this case, Your Honor has sentenced several defendants with offense levels and criminal history categories that are similar to Nicholas' to non-jail sentences. For example, Your Honor sentenced Bryan Zuriff, who had an offense level of 10 and a Guidelines range of 6 – 12 months, to two years of probation with six months home confinement, along with community service and a fine. (Docket No. 471). William Barbalat, who also had a Guidelines range of 6 – 12 months, was sentenced to two years of probation and community service. (Docket No. 522). Finally, Justin Smith, who also had a Guidelines range of 6 – 12, received a sentence of two years' probation with three months home confinement, community service and a fine. (Docket No. 560).

Here, where Nicholas' Guidelines range is less than that of Zuriff, Barbalat and Smith, a custodial sentence would create exactly the unwarranted disparity that 18 U.S.C. § 3553(a)(6) protects against. Indeed, thus far, the only defendants to received prison time – Kirill Rapoport and Edwin Ting – are easily distinguishable.

- 21 -

Rapoport was sentenced to a term of incarceration, as this Court noted at sentencing, in large part to "the unmistakable specter of violence that hangs over the conduct that Mr. Rapoport has pleaded guilty to and is charged with." *U.S. v. Rapoport*, No. 13 Cr. 268 (JMF) (Dec. 19, 2013 Hr'g Tr. 20:8-10). Clearly, the distinction that justified Mr. Rapoport's incarceration is simply not present in Nicholas' conduct.

Ting pled guilty on September 4, 2013 to running an illegal gambling operation in violation of 18 U.S.C. § 1955. The offense level was 12, with a corresponding Guidelines range of 10 – 16. As the Government noted, between 2010 and 2013, Ting operated what was likely the largest and most high-stakes illegal poker game in New York City. U.S. Sent. Mem. at 1, *U.S. v. Ting*, No. 13 Cr. 268 (S.D.N.Y.). Ting, who received two leadership points pursuant to U.S.S.G. § 3B1.1(c), agreed to forfeit $2,000,000 as a result of the offense. *Id.* at 8. In addition, unlike Nicholas, Ting is a recidivist, having been convicted in 2005 in New York state court for operating an illegal gambling business. *Id.* at 9.

At his guilty plea allocution, Nicholas stood before the Court and took responsibility for his actions. His conduct was wrong and he admits that. But when handing down a sentence under Section 3553(a), respectfully, the Court should measure Nicholas' conduct against the benchmark of similarly situated defendants. In both this District and this case, similarly situated defendants receive non-custodial sentences, and Nicholas should as well.

---

[8] *U.S. v. Blake*, No. 10 Cr. 349 (RPP) (S.D.N.Y.).

## Conclusion

For the foregoing reasons, Nicholas respectfully submits that a below-the-range sentence and $25,000 forfeiture is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Dated:   New York, New York         ALSTON & BIRD LLP
          February 11, 2013

_____
Craig Carpenito
Brian Fields
90 Park Avenue
New York, New York 10016
(212) 210-9400

*Counsel for Defendant Nicholas Hirsch*